Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| BOLD ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, NATURAL RESOURCES DEFENSE COUNCIL, INC., and SIERRA CLUB,<br><br>      Plaintiffs,<br><br>      v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; U.S. BUREAU OF LAND MANAGEMENT; and U.S. FISH AND WILDLIFE SERVICE,<br><br>      Defendants, | CV -20-59-GF-BMM-JTJ<br><br>**Complaint for Declaratory and Injunctive Relief**<br><br>(National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*.; Endangered Species Act, 16 U.S.C. § 1531 *et seq*.; Mineral Leasing Act, 30 U.S.C. § 181 *et seq.*; Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.) |

## INTRODUCTION

1.    This case involves the U.S. Bureau of Land Management's (Bureau's) unlawful grant of a right-of-way and temporary use permit for the proposed Keystone XL pipeline project. Keystone XL would move massive quantities of tar sands crude oil—one of the planet's most environmentally destructive energy sources—from Canada to Steele City, Nebraska, threatening the wildlife, waterways, and communities along its path. The Bureau's decision to dedicate public lands to this project, and the federal government's underlying environmental review of it, violated a host of federal statutes.

2.    Plaintiffs Bold Alliance, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council, and Sierra Club previously prevailed in a challenge to federal approvals of the Keystone XL pipeline in the U.S. District Court for the District of Montana.[1] In late 2018, the court held that the U.S. Department of State's (State Department's) 2017 issuance of a cross-border permit and associated environmental reviews violated the National Environmental Policy Act (NEPA), Endangered Species Act (ESA), and Administrative Procedure Act (APA), and accordingly enjoined project construction and remanded to the State Department for further environmental analysis. Partial MSJ Order at 10-12,

---

[1] Five of the six plaintiff groups from that earlier suit are plaintiffs here. Given the overlap, this Complaint uses "Plaintiffs" when referring to both the previous and instant lawsuit.

*N. Plains Res. Council v. Shannon*, No. 17-cv-31-BMM (D. Mont. Aug. 15, 2018),

ECF No. 202; Second MSJ Order at 50-54, *N. Plains Res. Council*, No. 17-cv-31-

BMM (D. Mont. Nov. 8, 2018), ECF No. 211.[2] That case also included a claim

against the Bureau, but because the Bureau had not yet acted, the court dismissed

the claim without prejudice. Order at 2, *N. Plains Res. Council*, No. 17-cv-31-

BMM (D. Mont. Nov. 15, 2018), ECF No. 212 (stating that "Plaintiffs remain free

to re-file a new cause of action based upon the [Bureau] rights-of-way when those

claims become ripe for review").

3.      The Bureau has now acted. It granted a right-of-way and temporary

use permit for Keystone XL pursuant to the Mineral Leasing Act (MLA) on

January 22, 2020, allowing the pipeline to cross approximately 44 miles of federal

land in Montana administered by the Bureau.

4.      That action is unlawful. The Bureau based its decision on revised

versions of the environmental review documents that *still* violate NEPA, the ESA,

and the APA because they make only a cursory attempt to rectify the problems

identified by the court. For example, the new Environmental Impact Statement

provides no support for its renewed conclusion that Keystone XL would have no

---

[2] The court's decision was also based on NEPA, ESA, and APA claims raised by
plaintiffs Indigenous Environmental Network and North Coast Rivers Alliance in a
consolidated case, *Indigenous Envtl. Network v. U.S. Dep't of State*, No. 17-cv-29-
BMM.

effect on tar sands development despite the precipitous drop in oil prices. And the revised documents continue to improperly minimize the likelihood of oil spills and the impacts of those spills on protected species.

5.      The Bureau also violated the MLA and Federal Land Policy and Management Act (FLPMA) by arbitrarily concluding that the project was consistent with those Acts' land-management requirements and by failing to impose measures that would adequately protect public health and safety and the surrounding environment. Finally, the Bureau violated the MLA when it issued a Notice to Proceed for construction at Keystone XL's border crossing—even though the right-of-way grant clearly stipulated that the project must obtain all necessary permits before any construction can begin, and several such permits remain outstanding.

6.      Plaintiffs therefore seek a declaration that the Bureau's issuance of a right-of-way, temporary use permit, and Notice to Proceed for Keystone XL violated NEPA, the ESA, the MLA, FLPMA, and the APA. Plaintiffs seek vacatur of Keystone XL's right-of-way, temporary use permit, and Notice to Proceed, and an injunction against any further construction of Keystone XL or issuance of federal approvals that rely on the inadequate environmental reviews described herein.

4

## JURISDICTION AND VENUE

7.     This case arises under NEPA, 42 U.S.C. § 4321 *et seq.*, the ESA,

16 U.S.C. § 1531 *et seq.*, the MLA, 30 U.S.C. § 181 *et seq.*, FLPMA, 43 U.S.C.

§ 1701 *et seq.*, and the APA, 5 U.S.C. § 701 *et seq*. This Court has jurisdiction

over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361

(mandamus), 28 U.S.C. §§ 2201-2202 (declaratory judgment), 16 U.S.C. § 1540(c)

& (g) (ESA), and 5 U.S.C. § 702 (APA).

8.     Plaintiffs have provided the Department of the Interior, Secretary of

Interior Bernhardt, the Bureau, and the U.S. Fish and Wildlife Service (Service)

with at least 60 days' written notice of the ESA violation alleged in their Second

Claim for Relief, in the form and manner required by the ESA, 16 U.S.C.

§ 1540(g)(2)(A)(i). A copy of Plaintiffs' February 13, 2020, notice letter is

attached as Exhibit A to this Complaint.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because

a substantial part of the events or omissions giving rise to the claim occurred here.

The proposed route for the Keystone XL pipeline enters the United States in

Montana and runs for approximately 44 miles through lands under the jurisdiction

of the Bureau in Montana. Plaintiffs challenge the Bureau's decision to grant a

right-of-way for the pipeline to use those Bureau-administered lands.

5

10.    Assignment to the Great Falls division of this Court is appropriate because Keystone XL would cross the U.S.-Canada border on Bureau-administrated land in Phillips County and would continue to cross Bureau-administered land in both Phillips and Valley Counties. These Counties are both within the Great Falls Division. D. Mont. L.R. 1.2(c)(3).

## PARTIES

### Plaintiffs

11.    Plaintiff Bold Alliance (Bold) is a network of individuals and not-for-profit environmental- and landowner-rights groups based in Nebraska and other rural states in the Midwest and South. It has more than 92,000 supporters across the country. Bold advocates for clean energy, fights fossil fuel projects, and works to protect rural landowners and landscapes, in cooperation with Tribal nations, farmers, ranchers, hunters, anglers, and environmentalists. Bold and its allies have spent years working to raise awareness of Keystone XL's threats to the people, land, wildlife, and water of Nebraska and other states, and to persuade our national and state officials to reject it.

12.    Plaintiff Center for Biological Diversity (the Center) is a national non-profit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 70,000 members and more than 1.7 million online supporters worldwide. The

6

Center has worked for decades to safeguard fresh water for people, plants, and animals. One of the Center's central goals is to protect imperiled species and the habitats they rely on. The Center's members and staff value and benefit from rare species' continued existence in the wild. They are concerned about industrial development and associated trends like global climate change and water degradation that threaten wild species' survival and recovery, as well as impacts to species from pipeline development, including from oil spills. The Center has worked for years to protect several imperiled species that would be harmed by Keystone XL.

13.     Plaintiff Friends of the Earth (FoE) is a non-profit advocacy organization founded in 1969. FoE has more than 325,000 members and more than 1.7 million activists across the United States. It is a member of Friends of the Earth International, which is the world's largest grassroots environmental network with 75 affiliates worldwide. FoE's mission is to defend the environment and champion a healthy and just world. FoE speaks truth to power and exposes those who endanger people and the planet. Its campaigns work to hold politicians and corporations accountable, transform our economic systems, protect our forests and oceans, halt climate chaos, and revolutionize our food and agriculture systems. Ending destructive tar sands development is one of FoE's top priorities.

14.     Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a national, not-for-profit public-health and environmental advocacy organization whose purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members, including members who own land and live in Montana and other states that Keystone XL would cross. Since its founding in 1970, NRDC has worked to enforce environmental laws and to reduce air and water pollution from, threats to wildlife and habitat from, and destruction of natural lands by industrial activity. NRDC has long fought to protect its members, the public, wildlife, and wild lands from the threats posed by the transporting, spilling, and burning of Canadian tar sands crude oil.

15.     Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. The Sierra Club has over 3.8 million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. The Sierra Club has chapters and members in each of the states through which Keystone XL would pass, including Montana. The Sierra Club's concerns encompass the protection of wildlands,

8

wildlife and habitat, water resources, air, climate, public health, and the health of its members, all of which stand to be affected by Keystone XL.

16.     In bringing this lawsuit, Plaintiffs stand in the shoes of members, staff, and other supporters who live, work, and recreate in places threatened by Keystone XL and who use, study, and cherish the land, wildlife, and other resources that may be irrevocably damaged by the project. Plaintiffs have numerous members and other supporters who live in Montana, South Dakota, and Nebraska—the states that Keystone XL would cross. Plaintiffs' members, other supporters, and staff include individuals who study and advocate for better protection of wildlife and other resources threatened by Keystone XL.

17.     For example, some of Plaintiffs' members own property on and near the proposed pipeline route. The project threatens these individuals' use and enjoyment, and the economic value, of their property. Some of Plaintiffs' members also enjoy hiking, picnicking, fishing, and observing wildlife in parks and along rivers near the proposed pipeline route, including in areas near or on the Bureau's right-of-way, and plan to return to those areas to pursue such activities in the future. In addition, some of Plaintiffs' members study and enjoy observing wild species whose survival and recovery are threatened by Keystone XL, including the critically endangered whooping crane and other federally protected Great Plains migratory birds, as well as other imperiled species such as the pallid sturgeon.

9

Some of these members are naturalists, biologists, and birdwatchers who visit areas near the proposed project route to study and observe these species, and have plans to return to these areas in the future to continue observing these species in their natural habitat.

18.     Defendants' approvals and inadequate environmental reviews of Keystone XL threaten the health, recreational, economic, professional, scientific, and aesthetic interests of Plaintiffs' members, staff, and other supporters.

19.     For example, the Bureau's Record of Decision and the other environmental analyses on which it relied did not adequately address the risk and consequences of oil spills from the pipeline. A spill on a member's land would interfere with their use and enjoyment of the property, threaten their water supply, and decrease property values. Similarly, the negative ecological effects of a spill would interfere with members' use and enjoyment of the wild spaces along the pipeline's route and their interest in observing, studying, and protecting imperiled species that live, feed, or breed there.

20.     By relying on inadequate environmental review documents prepared under NEPA and the ESA, refusing to undertake formal ESA consultation for Keystone XL for several endangered and threatened species, failing to ensure the project's consistency with the Bureau's land-management mandates and other statutory obligations, and neglecting the study and pursuit of viable alternatives

and mitigation measures, Defendants failed to reduce the project's negative impacts on and threats to Plaintiffs' members, other supporters, and staff. Further, by issuing a Notice to Proceed with construction that violated the right-of-way grant's terms and conditions—namely, that all approvals for Keystone XL be issued—Defendants have allowed these impacts to occur before they can properly be analyzed and have risked prejudicing the results of those remaining approvals.

21.     The declaratory and injunctive relief Plaintiffs seek in this lawsuit will redress their injuries by setting aside Defendants' approvals and requiring Defendants to comply with the law. This relief will give Plaintiffs, their members, other supporters, staff, and the general public more comprehensive and complete information regarding Keystone XL's threats to valued resources. It will allow Plaintiffs, their members and supporters, and others who are concerned about Keystone XL to advocate more effectively for denial of the project or changes to its design and operation that would help mitigate its adverse impacts (including, but not limited to, conservation measures that would better protect listed species). And it will give federal, state, and local decisionmakers the chance to make better-informed decisions about whether and on what terms to approve the project, unbiased by any bureaucratic momentum or irretrievable commitment of resources.

**Defendants**

22.     Defendant Department of the Interior (Interior Department) is a federal agency. The Interior Department's chief administrator is the Secretary of the Interior. The Interior Department, through its sub-agency U.S. Bureau of Land Management, decides whether to grant rights-of-way for the construction, operation, and maintenance of oil pipelines and associated facilities that cross land administered by the Bureau. In carrying out its permitting responsibilities, the Interior Department must comply with NEPA, the ESA, the MLA, FLPMA, and the APA. The Interior Department, through its sub-agency, the U.S. Fish and Wildlife Service, is also responsible for assuring other agencies' compliance with the ESA.

23.     Defendant David Bernhardt is the Secretary of the Interior. In his official capacity, Secretary Bernhardt, or his subordinates, are responsible for deciding whether to grant rights-of-way for the construction, operation, and maintenance of oil pipelines and associated facilities that cross land administered by the Bureau. In carrying out these duties, Secretary Bernhardt must ensure the Interior Department's and Bureau's compliance with NEPA, the ESA, the MLA, FLPMA, and the APA.

24.     Defendant U.S. Bureau of Land Management (Bureau) is a sub-agency of the Interior Department. The Bureau decides whether to grant rights-of-

way for the construction, operation, and maintenance of oil pipelines and associated facilities that cross land it administers. In carrying out its permitting responsibilities, the Bureau must comply with NEPA, the ESA, the MLA, FLPMA, and the APA.

25.    Defendant U.S. Fish and Wildlife Service (Service) is another sub-agency of the Interior Department. The Service is required by law to protect and manage the fish, wildlife, and native plant resources of the United States, including through implementation and enforcement of the ESA. The Service is responsible for ensuring that the Bureau's permitting decisions comply with the ESA.

**LEGAL BACKGROUND**

**The National Environmental Policy Act (NEPA)**

26.    NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted it in 1970 "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

27.    NEPA seeks to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c). When the federal government acts

before fulfilling its NEPA obligations, courts shall set aside the action until the government complies with NEPA.

28.     The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President. 42 U.S.C. § 4342. CEQ has promulgated general regulations implementing NEPA. 40 C.F.R. §§ 1500-1508.

29.     NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—commonly known as an environmental impact statement (EIS)—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii). The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1.

30.     An EIS must include a "full and fair discussion" of the "direct," "indirect," and "cumulative" effects of the action, as well as a discussion of "[m]eans to mitigate adverse environmental impacts." *Id.* §§ 1502.1, 1502.16(a), (b) & (h), 1508.25(c). Direct impacts are "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impacts are the "incremental impact[s]

14

of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

31.    Agencies must include analysis of any "connected" actions in the same EIS. *Id.* § 1508.25(a)(1). Connected actions are those that "[a]utomatically trigger other actions which may require environmental impact statements," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.*

32.    The EIS must also inform federal agency decision-makers and the public of the "reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1. This analysis of alternatives is the "heart" of the EIS—*i.e.*, where the agency should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." *Id.* § 1502.14. The EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," including the "alternative of no action." *Id.* § 1502.14(a), (d).

33.     An EIS must also "specify the underlying purpose and need to which the agency is responding" in proposing the action the EIS describes and the alternatives the EIS identifies. *Id.* § 1502.13.

34.     Any federal agency that is considering approving an activity that may significantly affect the environment must first prepare a draft EIS. The agency must solicit comments on that draft from the public, any other federal agency that has jurisdiction or special expertise on the subject matter, and Indian Tribes when the project may affect a reservation. *See id.* §§ 1502.9(a), 1503.1(a). The agency must then prepare a final EIS based on its consideration of those comments. *Id.* §§ 1502.9(b), 1503.4(a). The agency must respond to comments by either making changes to the EIS or explaining why the comments do not warrant further agency response. *Id.* At the conclusion of the EIS process, an agency must issue a record of decision pursuant to *Id.* § 1505.2.

35.     If, after the EIS is prepared, there are significant new circumstances or information relevant to the environmental impacts of a proposed action, the agency must prepare a supplemental EIS before deciding whether to approve the action. *Id.* § 1502.9(c)(1). A supplemental EIS must be prepared and circulated in the same way as the draft EIS and final EIS. *Id.* § 1502.9(c)(4).

36.     A "cooperating agency" is a federal agency other than the lead agency that has jurisdiction by law or special expertise about any environmental impact of

16

the project. *Id.* § 1508.5. Cooperating agencies are required to participate in the NEPA process at the earliest possible time and assume responsibility, at the lead agency's request, for preparing environmental analyses in areas concerning the cooperating agency's special expertise. *Id.* § 1501.6(b). A cooperating agency may adopt without recirculating the EIS of a lead agency "when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied." *Id.* § 1506.3(c).

### The Mineral Leasing Act (MLA)

37.     Section 28 of the MLA authorizes the "Secretary of the Interior or appropriate agency head" to issue rights-of-way and temporary use permits for oil pipelines. 30 U.S.C. § 185(a), (e). Where all federal lands involved are under the jurisdiction of a single agency, that agency's head may grant a right-of-way or permit. *Id.* § 185(c)(1). If two or more agencies administer the affected lands, then the Secretary is charged with determining whether to issue a right-of-way or permit, after consulting with the agencies involved. *Id.* § 185(c)(2).

38.     Under the MLA, no right-of-way through federal lands may be granted where it "would be inconsistent with the purposes of the reservation." *Id.* § 185(b)(1).

39.     The Bureau's implementing regulations likewise provide that the Bureau may deny an MLA right-of-way application where the "proposed use is

17

inconsistent with the purpose for which BLM or other Federal agencies manage the lands" at issue, where "[t]he proposed use would not be in the public interest," or where issuing a right-of-way "would be inconsistent with" the MLA or other laws or regulations. 43 C.F.R. § 2884.23(a)(1)-(2), (4). The regulations further mandate that the Bureau's objectives in administering its right-of-way responsibilities include "[p]rotect[ing] the natural resources associated with Federal lands and adjacent lands, whether private or administered by a government entity," and "prevent[ing] unnecessary or undue degradation to public lands." *Id.* § 2881.2(a), (b).

40.     In determining whether to grant a right-of-way, agencies must also comply with the requirements of NEPA and the ESA. 30 U.S.C. § 185(h)(1); *see also* 42 U.S.C. § 4332(2)(C); 16 U.S.C. § 1536(a)(2).

41.     If an agency decides to grant a right-of-way, the MLA requires that the grant "shall be subject to regulations . . . and such terms and conditions as the Secretary or agency head may prescribe regarding extent, duration, survey, location, construction, operation, maintenance, use, and termination." 30 U.S.C. § 185(f).

42.     The MLA requires, in turn, that the Secretary or agency head exercise this regulatory authority to "impose requirements for the operation of the pipeline and related facilities in a manner that will protect the safety of workers and protect

18

the public from sudden ruptures and slow degradation of the pipeline." *Id.*
§ 185(g). The granting agency must also "issue regulations or impose stipulations
which shall include . . . requirements designed to control or prevent (i) damage to
the environment (including damage to fish and wildlife habitat), (ii) damage to
public or private property, and (iii) hazards to public health and safety." *Id.*
§ 185(h)(2).

43.     The MLA further mandates that "[e]ach agency head shall administer
and enforce the provisions of this section, appropriate regulations, and the terms
and conditions of rights-of-way or permits" within the agency's jurisdiction. *Id.*
§ 185(c)(2). The Bureau has established by regulation various "terms and
conditions" for "construction, operation, maintenance, and termination of the
project" that MLA grantees must "comply with, and be bound by." 43 C.F.R.
§ 2885.11(b). The Bureau may impose additional project-specific stipulations. *Id.*
§ 2885.11(b)(22).

44.     The Bureau's standard terms and conditions provide that a grantee
must "[n]ot use or construct on the land in the right-of-way" or permit area until
the Bureau issues "a Notice to Proceed for all or any part of the right-of-way" or
permit area. *Id.* § 2885.11(21)(ii); *see also id.* § 2886.10(a).

45.     A grantee's failure to comply with the MLA may result in suspension
or termination of the right-of-way, following notice and an administrative

19

proceeding. 30 U.S.C. § 185(o)(1). An agency may also order "an immediate

temporary suspension of activities within a right-of-way or permit area" if

"necessary to protect public health or safety or the environment." *Id.* § 185(o)(2);

*see also* 43 C.F.R. § 2886.16(a).

### The Federal Land Policy and Management Act (FLPMA)

46.     In issuing rights-of-way pursuant to the MLA, the Bureau must also

comply with its land-management directives under FLPMA. FLPMA provides that

the Bureau "shall manage the public lands under principles of multiple use and

sustained yield." 43 U.S.C. § 1732(a).

47.     "Multiple use" incorporates "a combination of balanced and diverse

resource uses that takes into account the long-term needs of future generations for

renewable and nonrenewable resources, including, but not limited to, recreation,

range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific

and historical values." *Id.* § 1702(c). FLPMA defines "sustained yield" as "the

achievement and maintenance in perpetuity of a high-level annual or regular

periodic output of the various renewable resources of the public lands consistent

with multiple use." *Id.* § 1702(h).

48.     To that end, BLM must prepare land use plans based on those

principles, *id.* § 1712(a), (c)(1), and manage the governed areas "in accordance"

with those plans, *id.* § 1732(a).

49.     In addition, FLPMA mandates that BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation" of public lands. 43 U.S.C. § 1732(b).

## The Endangered Species Act (ESA)

50.     With the ESA, Congress intended endangered species to be afforded the highest of priorities. The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

51.     Species listed by the Service as "threatened" or "endangered" are accorded the ESA's protections. Under Section 7(a)(2) of the ESA, all federal action agencies must, "in consultation with" the Service, "insure" that the actions that they fund, authorize, or undertake are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2).

52.     The ESA's regulatory definition of "action" is broad and includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. To "jeopardize" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the

survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.*

53.     Section 7(a)(2) and its implementing regulations set forth a detailed process that must be followed before agencies take or approve actions that may affect threatened or endangered species or critical habitat. Fulfillment of this process is the only means by which an agency ensures that its affirmative duties under Section 7(a)(2) are satisfied. In fulfilling the requirements of Section 7(a)(2), agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

54.     Pursuant to the consultation process, any agency considering whether to authorize, fund, or carry out an activity must first ask the Service whether any listed species are present in the relevant area for the proposed action. *Id.* § 1536(c)(1). The "action area" includes "all areas" that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. If the Service determines that listed species may be present in the action area, the action agency must prepare a "biological assessment" that "evaluate[s] the potential effects of the action" on listed species and their habitat. *Id.* §§ 402.02, 402.12.

55.     If the action agency concludes in its biological assessment that an action is "not likely to adversely affect" listed species, and the Service concurs

22

with that determination in writing, the action agency typically relies on the

biological assessment and concurrence (known as "informal consultation") to

satisfy its ESA obligations. *See id.* §§ 402.13(a), 402.14(a)-(b). However, if the

biological assessment does not provide an adequate factual basis for the Service's

concurrence in a "not likely to adversely affect" finding, or if the Service's

concurrence is otherwise arbitrary, capricious, an abuse of discretion, or not in

accordance with the ESA, the Service's concurrence is unlawful and must be set

aside. *See* 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2).

56.     If an action agency determines in its biological assessment that an

action is "likely to adversely affect" listed species or their critical habitat, or if the

Service does *not* concur in the action agency's determination in its biological

assessment that the action is "*not* likely to adversely affect" listed species or their

critical habitat, the action agency must enter into a more extensive consultation

process with the Service on the action's threats to listed species and their critical

habitat (known as "formal consultation"). *See* 50 C.F.R. §§ 402.14(a)-(b),

402.12(k). The threshold for triggering this formal consultation requirement is very

low. *See* 51 Fed. Reg. 19,926, 19,949-50 (June 3, 1986).

57.     In formal consultation, the Service prepares a "biological opinion"

which considers the "effects of the action" and determines "whether the action,"

taken together with cumulative effects, "is likely to jeopardize the continued

23

existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g).

58.     The "effects of the action" are "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* § 402.02. In turn, a "consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." *Id.* These effects "may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* The "effects of the action" must be considered together with the "[c]umulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

59.     The biological opinion is the heart of the formal consultation process, and results in either a "likely to jeopardize" or a "no jeopardy" conclusion. 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(h)(1)(iv). If the Service determines that "jeopardy" is likely to occur, it must prescribe in the biological opinion "reasonable and prudent alternatives" to avoid this result. 50 C.F.R. § 402.14(h)(2).

60.     If the Service concludes that an action is not likely to jeopardize listed species, it must provide the action agency with a written statement, commonly

24

known as an "incidental take statement." *See* 16 U.S.C. § 1536(a)(2), (b)(4);

50 C.F.R. § 402.14(i). The incidental take statement must set forth those

"reasonable and prudent measures" that are necessary or appropriate to minimize

take, and the "terms and conditions" that must be complied with by the action

agency to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4);

50 C.F.R. § 402.14(i)(1)(ii), (iv).

61.     Section 7(d) of the ESA provides that once a federal agency initiates

consultation, the agency, as well as any applicant for a federal permit, "shall not

make any irreversible or irretrievable commitment of resources with respect to the

agency action which has the effect of foreclosing the formulation or

implementation of any reasonable and prudent alternative measures which would

not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). The purpose of

Section 7(d) is to maintain the environmental status quo pending the completion of

consultation. Section 7(d)'s prohibition remains in effect throughout the

consultation period, until the federal agency has satisfied its obligations under

Section 7(a)(2) and ensured that the action will not result in jeopardy to listed

species or adverse modification of critical habitat.

## The Administrative Procedure Act (APA)

62.    The APA makes judicial review available to "person[s] suffering legal wrong because of agency action." 5 U.S.C § 702. It also provides the standard of review for ESA citizen suit claims.

63.    Under the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983). In reviewing that explanation, courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citation omitted).

64.    A reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion," "in excess of statutory jurisdiction, authority, or limitations or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

## FACTS

### The Keystone XL Pipeline

65.    If built, the Keystone XL pipeline would be approximately 1,200 miles long and made of three-foot-wide steel pipe. It would stretch from Canada's tar sands mining region through Montana and South Dakota to southern Nebraska.

26

The applicant, TC Energy, would build the pipeline in a 50-foot-wide permanent right-of-way. The project would cross approximately 46 miles of federal lands, including at the U.S.-Canada border crossing.

66.     Keystone XL would import Canadian tar sands and other crude oil from Hardisty in Alberta, Canada to Steele City, Nebraska. In Steele City, Keystone XL would connect to TC Energy's existing pipeline network, which serves refineries and export terminals on the Gulf Coast. Connecting Keystone XL to the existing network would allow TC Energy to move as many as 830,000 barrels (about 35 million gallons) of crude oil from Canada to the Gulf Coast every day. If TC Energy receives a waiver to operate the pipeline at higher pressure, that capacity may increase to 900,000 barrels per day. Keystone XL would be one of the largest oil pipelines ever built in the United States.

67.     There is no requirement that gasoline and other finished products made from Keystone XL's oil be sold on U.S. markets, and most of the refined product would likely be exported to other countries.

68.     Keystone XL would increase the extraction, transport, refining, and burning of oil derived from tar sands, one of the dirtiest and most destructive fuels on our planet. Tar sands crude oil—also known as oil sands crude oil, bitumen, or Western Canadian Sedimentary Basin crude oil—is an unconventional petroleum

source that is mined from a mixture of sand and clay underlying the boreal forests
and wetlands of Alberta, Canada.

69.     Tar sands crude oil is not extracted from the ground like other types of
oil. Instead, oil companies use two unconventional mining methods to extract oil
from tar sands deposits: strip mining and in-situ drilling. At open-pit strip mines,
large swaths of boreal forest are cleared so that excavators and trucks can dig the
tar sands from the ground. At in-situ drilling operations, steam is injected into the
ground to melt the subterranean tar sands deposits. The oil gathers in wells and is
pumped up to the surface for processing. These tar sands mining methods are
energy intensive and cause significant air and water pollution. They also destroy
and fragment habitat for the wildlife of Canada's boreal forests, including lynx,
caribou, grizzly bears, songbirds, and waterfowl.

70.     The mining and subsequent processing of tar sands also generates
large amounts of carbon dioxide and other greenhouse gases that contribute to
climate change. As oil companies clear the land to create tar sands mines, they
destroy forests and wetlands, which serve as carbon sinks. Mining the tar sands
also takes a significant amount of energy; the burning of fossil fuels to create that
energy releases greenhouse gases. After it is mined from the ground, the bitumen
must be processed and diluted with various chemicals to make it liquid enough to
be pumped at high pressure through an oil pipeline. This process, which converts

the bitumen into "diluted bitumen," or "dilbit," requires yet more energy and releases yet more greenhouse gases. Once the dilbit reaches refineries, the added chemicals must be separated from the bitumen before the bitumen can be refined into gasoline and other finished oil products. Refining heavy bitumen is significantly more energy (and thus greenhouse-gas) intensive than refining conventional crude oil. The ultimate consumption of tar sands-derived products, such as gasoline, also releases significant amounts of greenhouse gases.

71.     As the latest EIS for Keystone XL estimates, the pipeline could increase annual greenhouse gas emissions by as much as 178.3 million metric tons of $CO_2$-equivalent per year. That is the same as operating 37.9 million passenger vehicles, powering 21.3 million homes, or running 45.9 coal-fired power plants. It is also the equivalent of 2.7 percent of all U.S. emissions.

72.     The significant greenhouse gas emissions enabled by Keystone XL would exacerbate climate change, one of the predominant environmental crises of our age, and has led Dr. James Hansen, an eminent climate scientist, to conclude that "Keystone XL is the fuse to the biggest carbon bomb on the planet." Hansen Decl. ¶ 6, *N. Plains Res. Council v. Shannon*, No. 18-36069 (9th Cir. Mar. 4, 2019), ECF No. 21-3. According to the National Oceanic and Atmospheric Administration, the last five years were the hottest on record. Higher surface temperatures cause a wide range of human and ecological harms, including sea-

level rise, coastal flooding, heat waves, increased risk of stronger hurricanes and extreme weather, increased risk of wildfires, water shortages, species extinction, habitat destruction, and shifting disease pathways.

73.    The transportation of tar sands crude oil through the Keystone XL pipeline also poses other serious threats to human health and the environment, particularly waterways. Oil pipelines routinely leak and spill oil, and dilbit is extremely difficult to clean up after a spill—much more so than conventional crude oils. The chemicals used to dilute the bitumen can vaporize into air or dissolve into water, leaving behind the heavy bitumen. Because it does not readily biodegrade and is incredibly viscous and sticky, bitumen is nearly impossible to remove from the natural environment, where it becomes a persistent source of oil pollution.

74.    Two dilbit spills from pipelines have highlighted how costly and damaging such spills can be. A 2010 tar sands crude oil spill in Michigan's Kalamazoo River led to a more than $1.2 billion cleanup effort, the most expensive oil pipeline cleanup in U.S. history, and took more than four years to complete. A 2013 spill in Mayflower, Arkansas contaminated an entire neighborhood and caused extensive health problems for residents, including headaches, nausea, fatigue, nosebleeds, bowel issues, and breathing problems.

75.    Problems with the Keystone I pipeline, also owned and operated by TC Energy, underscore the significant spill risks associated with crude oil

pipelines. When it began shipping dilbit through Keystone I in June 2010, TC Energy claimed that "[c]onstruction and operation of the Keystone Pipeline system will continue to meet or exceed world class safety and environmental standards."[3] But in its first year of operation alone, Keystone I leaked at least 14 times and was temporarily shut down by U.S. authorities. In April 2016, Keystone I spilled 16,800 gallons and, in November 2017, spilled another 210,000 gallons. Both of these major spills occurred in South Dakota. In October 2019, Keystone I spilled yet again, this time releasing 383,000 gallons—about half an Olympic-sized swimming pool's worth—in North Dakota.

76.     Spills from Keystone XL could be particularly harmful because they threaten aquifers that serve as the main or sole source of drinking and irrigation water for many people. The proposed route would cross parts of the Northern Great Plains Aquifer System, which supplies communities in eastern Montana, and the Ogallala Aquifer, which supplies most of Nebraska's drinking and irrigation water. The Ogallala is the United States' largest freshwater aquifer. As development and climate change increase competition for and stress on water supplies, protecting our freshwater aquifers will become ever more important.

---

[3] Press Release, TC Energy, *Keystone Pipeline Starts Deliveries to U.S. Midwest* (June 30, 2010), https://www.tcenergy.com/announcements/2010/2010-06-30keystone-pipeline-starts-deliveries-to-u.s.-midwest/.

Keystone XL would threaten these aquifers directly and threaten surface waters that are hydrologically connected to the aquifers.

77.    Spills from Keystone XL would also adversely affect several endangered and threatened species. The pipeline would pass through areas used by endangered whooping cranes and two other federally protected birds, the endangered interior least tern and threatened piping plover. It would also pass through habitat for the endangered American burying beetle and cross several major rivers that provide habitat for endangered pallid sturgeon and Topeka shiner. Oil spills could devastate habitat for these protected species. Oil spills could also directly harm these species through crude oil ingestion, oiling of plumage, bioaccumulation, and oil transfer to eggs and young, which could in turn result in mortality, reduced hatching success, deformities, and developmental delays.

78.    Construction of Keystone XL would also be extremely damaging to the lands, communities, waterways, and wildlife along the pipeline's route. Construction would require a 110-foot-wide corridor, more than double the width of the permanent right-of-way. For comparison's sake, that is similar to the width of Interstate 15 in central Great Falls, which is approximately 115 feet wide.

79.    To prepare for construction, TC Energy has been clearing and will continue to clear the right-of-way of vegetation. Those clearing activities would result in the permanent loss of 52 acres of trees and destroy 356 miles of native

grasslands, which could take more than 100 years to recover.[4] Beyond the right-of-way, construction will also involve the preparation of several worker camps, pipe yards, pump stations, and access roads.

80.    Construction activities would generate significant noise and traffic, disturbing nearby communities and wildlife. They would also send thousands of workers into these local communities, straining their resources and infrastructure. The presence of these workers poses unique threats to tribal communities. As the Rosebud Sioux Tribe and Fort Belknap Indian Community have informed the court, the influx of thousands of workers is a direct public health threat in light of the ongoing COVID-19 pandemic. Mem. Supp. TRO at 15, *Rosebud Sioux Tribe v. Trump*, No. 18-cv-118-BMM (D. Mont. Mar. 17, 2020), ECF No. 131. The Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation have likewise informed the court of this significant health threat, as well as the risk that the worker camps will exacerbate the missing and murdered indigenous women and girls crisis. Compl. ¶¶ 109-10, 123-27, *The Assiniboine & Sioux Tribes of the Fort Peck Indian Rsrv. v. U.S. Dep't of the Interior*, No. 20-cv-44-BMM (D. Mont. May 29, 2020), ECF No. 1.

---

[4] These numbers are taken from the 2014 EIS. It is impossible to determine what the updated numbers for the full route are, as the 2019 EIS generally focuses on the Nebraska route only and, in many cases, uses different units of measurement.

81.     Construction activities would also harm the hundreds of rivers, streams, and wetlands that the pipeline would cross. TC Energy would drill tunnels under the largest rivers, which include the Yellowstone, Missouri, Milk, Frenchman, Cheyenne, Bad, White, Elkhorn, and Platte, using horizontal directional drilling. This type of drilling presents a risk of "frac-outs," which occur when pressurized drilling fluids and lubricants—many toxic—escape the active bore, migrate up through the soils, and come to the surface at or near the construction site or in the waterbody. TC Energy would use an "open cut" method—excavating a trench in the streambed while water is flowing—to cross most other streams and rivers. These activities will increase sediment pollution and increase the risk of frac-outs and oil spills in waters that support fish and other wildlife (including protected species) and that people along the proposed route use for drinking, recreation, and agriculture. Construction in wetlands would be particularly damaging, as it can destroy precious wildlife habitat, including foraging, nesting, spawning, rearing, and resting sites for migratory birds. It can also damage and destroy the wetland plants that influence water chemistry and trap sediments and other pollutants, harming water quality.

82.     To build the project, TC Energy will use pipes that have been stockpiled at outdoor sites since 2011.[5] A recent study by the company's own engineers found that this prolonged exposure to sunlight has degraded the anti-corrosion coating on exposed pipes, affecting their integrity.[6]

### The State Department's Approval of Keystone XL

83.     In September 2008, TC Energy submitted an application to the State Department as required by Executive Order 13,337 for approval of a cross-border permit for the proposed Keystone XL pipeline. TC Energy also applied to the Bureau for a right-of-way to build the pipeline over federal lands in Montana, pursuant to Section 28 of the MLA.

84.     Because Executive Order 13,337 required the State Department to determine whether the project "would serve the national interest," the State Department acted as the lead agency in the Keystone XL NEPA process. The Bureau elected to participate as a cooperating agency in preparation of the EIS.

---

[5] *See* Keith Coulson et al., *Study of Stockpiled Fusion Bond Epoxy Coated Pipe*, Corrosion Mgmt., Jan./Feb. 2020, at 16; Lauren Donovan, *Mothballed Pipe in Storage for Years for Keystone XL Pipeline Might Finally Be Used*, Billings Gazette (Jan. 26, 2017), https://billingsgazette.com/news/state-and-regional/montana/mothballed-pipe-in-storage-for-years-for-keystone-xl-pipeline-might-finally-be-used/article_ff9dc908-5f59-5735-a8be-60c1cc162f39.html.

[6] Coulson et al., *supra* n.5, at 19.

The State Department issued a Draft EIS in April 2010, supplemented that draft in April 2011, and issued a Final EIS in August 2011 (2011 EIS).

85.     In January 2012, the State Department denied the first permit application. TC Energy subsequently reapplied for a cross-border permit on May 4, 2012, but constructed the southern segment of Keystone XL as a separate project called the Gulf Coast Pipeline, which is now operational.

86.     On December 21, 2012, the State Department issued a Biological Assessment for the Keystone XL project and requested formal ESA Section 7 consultation with the Service regarding the American burying beetle. According to the Biological Assessment, the State Department was acting as the "lead agency" for the agencies involved in the consultation, including the Bureau. Thus, the federal agency actions covered by this consultation included not only the State Department's cross-border permit, but also other federal agencies' actions pertaining to Keystone XL. The Service also issued a Biological Opinion for Keystone XL on May 15, 2013.

87.     In January 2014, the State Department issued a Final Supplemental EIS (2014 EIS) for Keystone XL. The 2014 EIS contained numerous flaws, including several critical errors raised by Plaintiffs and others in their comments on the Draft EIS.

88.    In November 2015, citing the project's climate impacts and other

significant threats to human health and the environment, the State Department

found that Keystone XL was contrary to the national interest and denied TC

Energy's application for a cross-border permit.

89.    On January 24, 2017, President Trump issued a presidential

memorandum inviting TC Energy to reapply for a cross-border permit and

directing the State Department to make a permitting decision within 60 days of TC

Energy's submission. TC Energy subsequently submitted a new application.

90.    Between January and March 2017, Plaintiffs repeatedly wrote to the

State Department to note that developments since the 2014 EIS further undermined

that document's core assumptions and associated predictions about Keystone XL's

environmental impacts, including a precipitous drop in oil prices, the occurrence of

additional major spills, and new studies regarding the additional difficulties of

cleaning up spills of diluted bitumen. In their March 13, 2017 letter, on which the

Bureau was copied, Plaintiffs also pointed out that the pipes TC Energy planned to

use were no longer new, as an earlier risk assessment had contemplated, but

instead had been exposed to the elements for years. Plaintiffs explained that these

significant new circumstances and information required the State Department and

cooperating federal agencies, including the Bureau, to prepare and take public

comment on a supplemental EIS before deciding whether to issue approvals for Keystone XL. *See* 40 C.F.R. § 1502.9(c).

91.     On March 23, 2017, the State Department found that Keystone XL "would serve the national interest" and issued TC Energy a cross-border permit. In issuing the permit, the State Department relied on the 2014 EIS to comply with NEPA and declined to prepare a supplemental EIS.

**Plaintiffs' Successful Challenge to the State Department's Approval**

92.     On March 30, 2017, Plaintiffs challenged the State Department's approval of Keystone XL as violating NEPA, the ESA, and the APA. In orders dated August 15 and November 8, 2018, the court held that the State Department violated NEPA and the APA by failing to supplement the 2014 EIS to evaluate new information about the project, including a newly approved route in Nebraska, changes in oil markets, Keystone XL's climate change impacts, and the impacts of tar sands oil spills into waterways, and by discarding its prior factual findings on climate change to support its change in course on the cross-border permit. Partial MSJ Order at 11-12; Second MSJ Order at 51-52. The court also found that the State Department and the Service violated the ESA by relying on outdated information regarding potential oil spills and thus failing to adequately assess the risk of spills on endangered species. Second MSJ Order at 53.

93.     The court vacated the State Department's Record of Decision, remanded to the State Department for preparation of a supplemental EIS, vacated the 2012 Biological Assessment and 2013 Biological Opinion, and enjoined project construction. *Id.* at 53-54.

94.     On March 29, 2019, while the court's decisions were on appeal and in an effort to circumvent the court's ruling, President Trump issued a new cross-border permit for Keystone XL. On June 7, 2019, the Ninth Circuit dismissed the case as moot, vacated the district court's opinions, and dissolved the injunction. Order, *N. Plains Res. Council*, No. 18-36069 (9th Cir. June 6, 2019), ECF No. 56.[7]

95.     On May 2, 2019, the State Department withdrew its 2012 Biological Assessment. The Service withdrew the 2013 Biological Opinion on the same day.

**The State Department's Revised NEPA Analysis for Keystone XL**

96.     Following President Trump's issuance of a new permit, the State Department continued to revise its NEPA analysis for Keystone XL, purportedly to address the deficiencies identified by the *Northern Plains* decision. The State Department recognized that other federal agencies would rely on that analysis for

---

[7] The new permit is the subject of ongoing litigation. *See* First. Am. Compl. at 101-11, 112-15, *Rosebud Sioux Tribe*, No. 18-cv-118-BMM (D. Mont. May 8, 2019), ECF No. 58; First Am. Compl. at 24-32, *Indigenous Envtl. Network v. Trump*, No. 19-cv-28-BMM (D. Mont. July 18, 2019), ECF No. 37.

their decisions on other aspects of Keystone XL, including the Bureau's decision whether to grant an MLA right-of-way for the project.

97.    On October 4, 2019, the State Department released a draft supplemental EIS, inviting public comment over a 45-day period. Plaintiffs submitted extensive comments pointing out several flaws in the draft. For example, Plaintiffs noted that the draft supplemental EIS's updated market analysis lacked adequate support, that its climate analysis misled the public about Keystone XL's emissions, that its oil-spill analysis similarly misled the public and remained incomplete, and that its analysis of listed species primarily focused on the likelihood of spills occurring in the species' habitats, ignoring the consequences of such spills were they to occur.

98.    On December 20, 2019, the State Department released the final supplemental EIS (2019 EIS). In significant respects, the 2019 EIS fails to cure the defects identified by the district court's prior orders and raised by Plaintiffs in their comments on the draft 2019 EIS.

99.    Specifically, in *Northern Plains*, the court held that the State Department was required to supplement its analysis because oil prices had fallen far below the breakeven point at which the 2014 EIS concluded that Keystone XL would have no effect on tar sands development. Rather than grapple with this new information, however, the draft 2019 EIS simply lowered the breakeven point to

40

match those lower prices. Plaintiffs' comments explained that the only support cited for the lower breakeven point was a study commissioned by TC Energy, which lacked independent reliability and contradicted other consultants' findings. The State Department nonetheless made no change to the final EIS and failed to discuss the contradictory evidence Plaintiffs provided.

100.   The court also held that the State Department was required to update its oil spill analysis. Yet the draft 2019 EIS revised its incident analysis to include spill data through 2017 only, and continued to erroneously claim that the risk of a spill was "unlikely." The draft similarly continued to ignore the unique risks posed by dilbit, including the well-documented difficulties of cleaning it up. Plaintiffs pointed out these flaws in their comments. They urged the State Department to add spill data through 2019, including three spills from TC Energy's own Keystone I pipeline; to acknowledge the likelihood of a spill; and to fully address the unique characteristics of dilbit. Apart from adding the more recent spill data, the State Department failed to update its analysis in the final EIS. The data make clear that Keystone XL is expected to spill much more frequently than previously predicted; yet the 2019 EIS obscures that fact by omitting any estimate about the risk of spills from the pipeline as a whole and continuing to label the risk of a spill "unlikely." And, though the 2019 EIS acknowledges that the type of oil Keystone XL would carry is harder to clean than conventional oil, it makes *no update* to the project's

spill response plans based on that distinction, nor offers any reasoned justification for its failure to do so.

101.   Finally, the court held that the State Department was required to address gaps in its analysis of Keystone XL's greenhouse gas emissions. Although the draft 2019 EIS evaluated the cumulative climate effects of Keystone XL and the Alberta Clipper expansion and used a newer model to analyze those emissions, it continued to downplay Keystone XL's overall climate impacts. Plaintiffs and others criticized the misleading nature of the draft's climate analysis. In response, the State Department acknowledged in the final EIS that Keystone XL's greenhouse gas emissions "would likely represent a potentially significant impact." Otherwise, it made no change to the EIS's skewed analysis of the project's costs and benefits. The 2019 EIS thus minimizes Keystone XL's climate harms by maintaining (erroneously) that tar sands will get to market regardless of whether Keystone XL is built, while illogically exaggerating the project's economic and security benefits by ignoring that very assumption.

**The Bureau's and Service's Revised ESA Analysis for Keystone XL**

102.   During this same period, the Bureau engaged in Section 7 consultation with the Service, releasing a new Biological Assessment for Keystone XL on November 26, 2019. The Bureau concluded that the project is "not likely to adversely affect" eight threatened or endangered species: the black-footed ferret,

42

interior least tern, piping plover, Rufa red knot, whooping crane, pallid sturgeon, Topeka shiner, and western prairie fringed orchid.[8]

103.   As noted above, the pipeline poses a significant risk to wildlife along the project route through leaks and spills of oil, which may catastrophically harm several of these protected species, including whooping cranes, interior least terns, piping plovers, pallid sturgeon, and Topeka shiners. In *Northern Plains*, the court held that the federal government's analysis of Keystone XL's impacts from oil spills on listed species was inadequate. Like the 2019 EIS, the 2019 Biological Assessment fails to remedy its predecessor's flaws.

104.   Using a "Pipeline Incident Analysis," the Biological Assessment concedes that at least some spills—and even *many* small spills (50-barrel)—are likely to occur in several listed species' habitats over the 50-year life of the project. The Biological Assessment nonetheless concludes that the overall risk of spills is

_____

[8] The Bureau determined that Keystone XL "may affect" the Northern long-eared bat, but relied on the Service's 2016 Programmatic Biological Opinion for that species to fulfill its consultation obligations. It also determined that the pipeline is "likely to adversely affect" the American burying beetle, and initiated formal consultation with the Service on that species. The Service subsequently issued a Biological Opinion and Incidental Take Statement for the American burying beetle, anticipating that the project, over its 50-year lifetime, would result in the take of 552 American burying beetles in South Dakota and Nebraska and concluding that this level of take is not likely to jeopardize the beetle. This take coverage extends only to Keystone XL's federal actions and lands; to obtain take coverage for the rest of the project, TC Energy has submitted an application under Section 10 of the ESA. On information and belief, that application is still pending.

low, and that therefore spills will not adversely affect these species. Based on that conclusion, the Biological Assessment provides only a limited discussion of the general impacts spills might have on the species, such as oiling of plumage and exposure to toxic constituents. It fails to fully analyze, based on the best available science, the consequences of such a spill were it to occur, including the number of individuals that would be affected, the short- and long-term effects of the associated contamination, and how those effects would impact the species' recovery and continued existence.

105.   On December 23, 2019, the Service issued a written concurrence agreeing with the 2019 Biological Assessment's "not likely to adversely affect" determinations. The concurrence letter contains no additional analysis of the impacts of oil spills on listed species.

### The Bureau's Approval of the Keystone XL Right-of-way

106.   In March 2008, TC Energy applied to the Bureau for a right-of-way under Section 28 of the MLA for Keystone XL to cross federal lands in Montana. TC Energy withdrew its right-of-way application in February 2016, after the State Department denied the cross-border permit.

107.   In February 2017, upon reapplying for a cross-border permit, TC Energy requested that the Bureau revive its right-of-way application and filed an updated Plan of Development in support of its application.

44

108.   On January 22, 2020, the Bureau approved TC Energy's application and issued a Record of Decision documenting the basis for its action. The Bureau granted a long-term 50-foot-wide right-of-way across approximately 46 miles of federal land.[9] The Bureau also granted a 30-foot-wide right-of-way for 2.84 miles of long-term access roads for the project. In addition, the Bureau issued a temporary use permit for a 60-foot-wide construction area along the right-of-way, another 122 acres of temporary work space areas, and roughly 11 miles of 30-foot-wide temporary access roads.[10]

109.   In support of its decision, the Bureau adopted the State Department's NEPA analyses from the 2011 EIS, the 2014 EIS, and the 2019 EIS. *See* 40 C.F.R. § 1506.3(c). It did not conduct any independent NEPA analysis. The Bureau also referenced its 2019 Biological Assessment.

110.   The Bureau asserted that its decision to grant the right-of-way was in keeping with the MLA's overarching policy and direction and the agency's "multiple-use mission." Record of Decision at 10. Using the EISs to inform its

[9] Roughly 1.8 miles of that total are lands administered by the U.S. Army Corps of Engineers (the Corps), which concurred in the Bureau's decision under the MLA.

[10] The Bureau also noted that Keystone XL requires additional rights-of-way for electrical lines to service pump stations, which are governed by FLPMA. The Bureau stated that it would evaluate the pending applications for FLPMA rights-of-way in a separate decision. On information and belief, the Bureau has not reached a final decision on those applications.

analysis, the Bureau then discussed various management considerations. For example, with regard to Keystone XL's climate impacts, the Bureau cited the 2019 EIS's conclusion that the project was not expected to significantly affect the rate of extraction or production of Canadian crude oil. The Bureau claimed that the project's greenhouse gas emissions would contribute only incrementally to global climate change. *Id.* at 13.

111.   In addressing the potential for oil spills and their effect on public health, safety, and the environment, the Bureau asserted that the 2014 and 2019 EISs analyzed these issues and argued that monitoring and mitigation measures had already been developed. However, these measures are inadequate for several reasons, including that they fail to account for the particular challenges of cleaning up dilbit spills. Additionally, neither the EISs nor the Record of Decision address the degradation of pipe segments that have been stored outdoors in direct sunlight for nearly a decade, or the potential impact that such degradation could have on Keystone XL's operational integrity.

112.   Upon granting the right-of-way, the Bureau cautioned that TC Energy could not "commence construction of any Project facilities or proceed with other ground-disturbing activities in connection with the Project on federal lands until [it] receives written Notice(s) to Proceed (NTP)." *Id.* at 7. The Bureau explained that, "[i]n accordance with 43 CFR 2886.10," the agency would "not issue any

NTPs" until TC Energy had met "all applicable [right-of-way] grant stipulations, terms, and conditions." *Id.*

113.   One such stipulation makes clear that TC Energy "shall not be permitted to use the granted areas for the proposed project until they have acquired all necessary Federal, State, or local permits, licenses, easements, etc. on Federal, State and/or private lands crossed by the project." *Id.*, App. F ¶ 1. On information and belief, TC Energy still needs to obtain several approvals for the Keystone XL project, including: (1) an incidental take permit under Section 10 of the ESA for the take of endangered and threatened species, including the American burying beetle, that will be harmed by pipeline-related activities on non-federal land; (2) approval from the Western Area Power Administration for interconnection to the federal transmission system to serve the electrical needs of several pump stations; (3) approval from the Rural Utilities Service to provide federal financing to several electric cooperatives to finance construction of power lines to deliver power to several pump stations; (4) certification from the Montana Department of Environmental Quality under Section 401 of the Clean Water Act for pipeline water crossings in Montana, many of which occur on BLM and Army Corps of Engineers lands; (5) a permit from Holt County, Nebraska to lay pipe through the county; and (6) several easements from landowners to cross private property in Nebraska.

114.   TC Energy must also obtain a permit under Section 404 of the Clean Water Act. It has sought to do so by relying on Nationwide Permit 12, a general permit that authorizes the construction of pipelines and other utility projects across U.S. waters under Section 404(e) of the Act. On July 1, 2019, Plaintiffs challenged the Corps' improper issuance of Nationwide Permit 12 and the improper use of Nationwide Permit 12 for Keystone XL. On April 15, 2020, the court ruled in Plaintiffs' favor on their ESA claim, remanded Nationwide Permit 12 to the Corps, and partially vacated and enjoined the Permit's use for the construction of new oil and gas pipelines, including Keystone XL. Order at 25-26, *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, No. 19-cv-44-BMM (D. Mont. Apr. 15, 2020), ECF No. 130.[11] On July 6, 2020, the Supreme Court stayed the court's order granting partial vacatur and an injunction pending appeal, except as to Keystone XL. *U.S. Army Corps of Eng'rs v. N. Plains Res. Council*, No. 19A1053, 2020 WL 3637662, at *1 (U.S. July 6, 2020). On information and belief, TC Energy has not applied for an individual permit under Section 404(a) of the Clean Water Act.

115.   On February 26, 2020, despite TC Energy's failure to secure the remaining approvals it needs (including those identified above), the Bureau's Miles City field office issued a Notice to Proceed with construction on Keystone XL's

---

[11] The court found it unnecessary to address Plaintiffs' NEPA and Clean Water Act claims at that time and denied the cross-motions for summary judgment as to those claims without prejudice. *Id.* at 21-22.

cross-border segment. TC Energy's application for the Notice to Proceed—which the Bureau approved—stated that TC Energy had acquired all necessary approvals, as required by the relevant stipulation. However, the supporting appendix simply omits all of the still-pending permits and other approvals needed. The Bureau did not provide public notice that it had issued a Notice to Proceed for Keystone XL's border-crossing segment.

116.   On information and belief, the Bureau has not yet issued a Notice to Proceed with construction on other portions of the right-of-way. However, the Bureau has demonstrated that it could issue such a notice at any time—despite the applicable stipulation—without public notice. On information and belief, TC Energy could, upon receiving the requisite Notice to Proceed, begin construction on the right-of-way in Montana as early as August 2020. Status Report at 3, *N. Plains Res. Council*, No. 19-cv-44-BMM (D. Mont. Jan. 14, 2020), ECF No. 103.

117.   On March 27, 2020, Plaintiffs sent a letter to the Bureau, pointing out that TC Energy had yet to obtain several approvals and that, accordingly, the Bureau could not issue a Notice to Proceed. (Plaintiffs were unaware that the Bureau had already done so, in direct contradiction of the terms and conditions of the right-of-way). Given the COVID-19 pandemic, Plaintiffs also urged the Bureau to consider whether to suspend TC Energy's grant and temporary use permit "to protect public health [and] safety," 43 C.F.R. § 2886.16(a), and to consider

49

whether the corresponding—and unprecedented—drop in oil prices required

supplementation of the 2019 EIS's analysis. The Bureau did not respond to

Plaintiffs' letter.

## FIRST CLAIM FOR RELIEF

**Violation of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*.,
and Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.,
by Defendants Interior Department, Secretary Bernhardt, and Bureau**

118.   Plaintiffs incorporate by reference all preceding paragraphs.

119.   The Bureau's grant of a right-of-way and temporary use permit for the

Keystone XL pipeline was a major federal action that requires compliance with

NEPA. 42 U.S.C. § 4332(2)(C). The State Department, as lead agency, prepared

EISs for the project in 2011, 2014, and 2019. The Bureau, as a cooperating agency,

adopted these EISs to fulfill its NEPA obligations before granting the right-of-way

and temporary use permit. *See* 40 C.F.R. § 1506.3(c).

120.   The 2014 and 2019 EISs do not include a full and fair analysis of

Keystone XL's significant direct, indirect, and cumulative environmental effects,

as NEPA requires. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.16(a), (b) &

(h), 1508.25(c). Among other things, the 2019 EIS provides no support for its

renewed conclusion that Keystone XL would have no effect on tar sands

development despite the precipitous drop in oil prices. It improperly minimizes the

likelihood of and impacts from oil spills. And, together with the 2014 EIS, it

unreasonably skews the project's costs and benefits.

121.   The Bureau's decision to grant a right-of-way and temporary use permit for Keystone XL in reliance on inadequate EISs violates NEPA and is arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

**Violation of the Endangered Species Act, 16 U.S.C. § 1531 *et seq*., and the
Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.,
by Defendants Interior Department, Secretary Bernhardt, and Bureau**

122.   Plaintiffs incorporate by reference all preceding paragraphs.

123.   Section 7(a)(2) of the ESA requires action agencies to ensure that their actions are not likely to jeopardize the continued existence of endangered or threatened species, and are not likely to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). To do so, agencies must rely on the best scientific information available, *id.*, and complete the procedural requirements set forth in the ESA's implementing regulations, 50 C.F.R. pt. 402.

124.   The Bureau failed to provide an adequate assessment of the potential harm to listed species from oil spills associated with Keystone XL before granting the right-of-way and temporary use permit. This failure was predicated on the agency's erroneous determination that the probability of a spill occurring in the species' habitat is low. Yet the Bureau's own spill risk analysis demonstrates that

there are likely to be numerous spills in several species' habitats throughout the life of the project.

125.   The 2019 Biological Assessment nonetheless focuses almost entirely on the likelihood of a spill occurring and provides only limited and general information on the adverse effects of such a spill. It therefore fails to analyze, using the best available science, the actual risk a spill would have on the continued existence of listed species should one occur in the species' habitat, such as the potential extent and persistence of contamination or the short- and long-term impacts of such contamination. In fact, the Biological Assessment fails to cite even one scientific article regarding the impacts to listed species from an oil spill.

126.   Had the Bureau completed this analysis, as the ESA requires, it would have been required to proceed with formal consultation to ensure that the proposed project will not jeopardize the species' continued existence or destroy or adversely modify their designated critical habitat.

127.   The Bureau's "not likely to adversely affect" determination in the 2019 Biological Assessment and failure to pursue formal consultation with the Service regarding those species violate Section 7(a)(2) of the ESA and the ESA's implementing regulations, and are also arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF

**Violation of the Endangered Species Act, 16 U.S.C. § 1531 *et seq*., and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*., by Defendants Interior Department, Secretary Bernhardt, and Service**

128.   Plaintiffs incorporate by reference all preceding paragraphs.

129.   Under the ESA, if a biological assessment does not provide an adequate basis for the Service's concurrence in a "not likely to adversely affect" finding, or if the Service's concurrence is otherwise arbitrary, capricious, an abuse of discretion, or contrary to law, the Service's concurrence must be set aside. *See* 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2). A Service concurrence is final agency action reviewable under the APA.

130.   As set forth above, the Bureau's 2019 Biological Assessment failed to provide an adequate assessment of the potential harm to listed species from oil spills associated with Keystone XL, despite the Bureau's own spill risk analysis demonstrating that there are likely to be numerous spills in several species' habitats throughout the life of the project. The 2019 Biological Assessment's "not likely to adversely affect" determination therefore violated the ESA.

131.   The Service's concurrence in the Bureau's "not likely to adversely affect" determination for Keystone XL provided no additional analysis of the impacts of oil spills on listed species, but rather just accepted the inadequate analysis provided by the Bureau.

132.   The Service's concurrence is contrary to the ESA and is also arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF

**Violation of the Mineral Leasing Act, 30 U.S.C. § 181 *et seq*., Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*, and Administrative Procedure Act, 5 U.S.C. § 701 *et seq*., by Defendants Interior Department, Secretary Bernhardt, and Bureau**

133.   Plaintiffs incorporate by reference all preceding paragraphs.

134.   The Bureau's decision to grant a right-of-way under the MLA must be consistent with the Bureau's multiple-use mandate for managing lands under its jurisdiction. *See* 43 U.S.C. § 1732(a); 43 C.F.R. §§ 2884.23(a)(1)-(2) & (4), 2881.2(a) & (b). In balancing the risks and benefits of allocating land to a pipeline right-of-way (as opposed to reserving the land for other potential uses), the Bureau cannot rely on reasoning that is arbitrary, capricious, an abuse of discretion, or otherwise unlawful. 5 U.S.C. § 706(2). The Bureau's grant of a right-of-way is final agency action reviewable under the APA.

135.   In its Record of Decision, the Bureau acknowledged that Keystone XL's climate impacts and risk of spilling oil were material to its decision, but found those impacts to be minimal and thus determined that granting the right-of-way was appropriate. The Bureau based its decision on faulty analyses from the 2014 and 2019 EISs, failing to undertake any independent evaluation of the

54

project's impacts to the public and to the environment. Accordingly, the Bureau

failed to rationally assess whether granting a right-of-way for Keystone XL was

consistent with the Bureau's multiple-use mandate.

136.   The Bureau's decision therefore violates the MLA and FLPMA and is

arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the

APA. 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF

**Violation of the Mineral Leasing Act, 30 U.S.C. § 181 *et seq*., Federal Land
Policy and Management Act, 43 U.S.C. § 1701 *et seq*., and Administrative
Procedure Act, 5 U.S.C. § 701 *et seq*.,
by Defendants Interior Department, Secretary Bernhardt, and Bureau**

137.   Plaintiffs incorporate by reference all preceding paragraphs.

138.   Upon granting a right-of-way for a pipeline, the MLA mandates that

the Bureau impose safety requirements that will "protect the public from sudden

ruptures and slow degradation of the pipeline." 30 U.S.C. § 185(g). The MLA also

requires that the Bureau set conditions to control or prevent environmental

damage, property damage, and public health and safety hazards, among other

things. *Id.* § 185(h)(2). Likewise, under FLPMA and the Bureau's implementing

regulations, the Bureau has an obligation to prevent unnecessary or undue

degradation on the lands within its jurisdiction. 43 U.S.C. § 1732(b); 43 C.F.R.

§ 2881.2(b).

139.   The Bureau's grant of a right-of-way for Keystone XL violates these duties. For example, the Bureau relied on oil spill response plans that are inadequate to address the oil spill risks posed by Keystone XL. Despite the 2019 EIS's acknowledgement that there are unique and significant challenges in cleaning up dilbit spills—requiring specialized response equipment—the Bureau imposed no conditions that would address those risks. Indeed, the outdated response plans that informed the Bureau's approval contain no requirements for TC Energy or its contractors to have available any of the specialized response equipment described by the 2019 EIS. Similarly, the Bureau did nothing to address the degradation of the pipes TC Energy is using to build the project, even though Plaintiffs brought this issue to the agency's attention over three years ago. In fact, TC Energy's own engineers recently found that the protective pipe coatings meant to prevent such degradation have been ineffective. Yet the Bureau's Record of Decision is silent on this issue.

140.   The Bureau's failure to impose adequate requirements to protect public health and safety and to avoid environmental damage and undue degradation violates the MLA and FLPMA, and its grant of a right-of-way is thus arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF

**Violation of the Mineral Leasing Act, 30 U.S.C. § 181 *et seq*., and
Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.,
by Defendants Interior Department, Secretary Bernhardt, and Bureau**

141.   Plaintiffs incorporate by reference all preceding paragraphs.

142.   The MLA authorizes the Bureau to grant rights-of-way and temporary use permits for pipelines passing through federal lands, and to condition those grants on certain project-specific terms, conditions, or stipulations. *See* 30 U.S.C. § 185(a), (f), (h)(2); 43 C.F.R. § 2885.11(b)(9). The Bureau may prohibit construction activities on the right-of-way until the grantee certifies that its proposed use is in compliance with all applicable terms, conditions, or stipulations, at which point the Bureau may issue the grantee a Notice to Proceed. 43 C.F.R. § 2886.10. The Bureau's issuance of a Notice to Proceed with construction under the MLA is final agency action reviewable under the APA.

143.   The Bureau's grant of a right-of-way and temporary use permit for Keystone XL is subject to over 30 stipulations. One such stipulation makes clear that TC Energy is not allowed to proceed with its proposed project until it has acquired all necessary federal, state, and local permits, licenses, and/or easements on federal, state, and/or private lands crossed by the project.

144.   TC Energy has not yet acquired all necessary federal, state, and local permits, licenses, and easements on federal, state, and private lands crossed by

Keystone XL. It therefore has not yet satisfied that stipulation of the right-of-way grant.

145.   Yet, on February 26, 2020, the Bureau's Miles City field office issued a Notice to Proceed with construction for Keystone XL's cross-border segment.

146.   The Bureau's issuance of a Notice to Proceed for Keystone XL's cross-border segment violates the MLA and is arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA. Likewise, any further issuances of Notices to Proceed for Keystone XL before TC Energy has satisfied all the stipulations of the right-of-way grant would violate the MLA and be arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that Defendants Department of the Interior, Secretary Bernhardt, and Bureau violated NEPA and the APA by issuing a right-of-way grant and temporary use permit for Keystone XL, in reliance on arbitrary and incomplete EISs;

B.     Declare that Defendants Department of the Interior, Secretary Bernhardt, and Bureau violated Section 7 of the ESA and the APA by failing to ensure, through formal consultation, that Keystone XL would not jeopardize the

continued existence of listed species, and by making an erroneous "not likely to adversely affect" determination for listed species that failed to adequately consider the impacts of oil spills that are likely to occur;

C.     Declare that Defendants Department of the Interior, Secretary Bernhardt, and Service violated the ESA and the APA by arbitrarily and capriciously concurring in the Bureau's "not likely to adversely affect" determination;

D.     Declare that Defendants Department of the Interior, Secretary Bernhardt, and Bureau violated the MLA, FLPMA, and the APA by arbitrarily and capriciously determining that a right-of-way grant and temporary use permit for Keystone XL were consistent with the Bureau's multiple-use mandate and obligation to avoid unnecessary or undue degradation, and by failing to impose adequate safety measures;

E.     Declare that Defendants Department of the Interior, Secretary Bernhardt, and Bureau violated the MLA and the APA by issuing a Notice to Proceed for Keystone XL's border-crossing segment;

F.     Vacate and set aside the Bureau's right-of-way grant and temporary use permit for Keystone XL, the accompanying Record of Decision, the Bureau's adoption of the State Department's 2011 EIS, 2014 EIS, and 2019 EIS, the

Bureau's 2019 Biological Assessment and the Service's December 2019

concurrence, and any Notices to Proceed issued for Keystone XL;

G.    Issue an injunction prohibiting any activity in furtherance of the

construction or operation of Keystone XL and associated facilities until Defendants

Department of the Interior, Secretary Bernhardt, and Bureau comply with NEPA,

the ESA, the MLA, FLPMA, and the APA, and until Defendant Service complies

with the ESA and the APA;

H.    Award Plaintiffs their costs of litigation, including reasonable attorney

and expert witness fees; and

I.    Grant such other and further relief as the Court deems just and proper.

Dated:        July 14, 2020            /s/ Timothy M. Bechtold
                                       Bechtold Law Firm, PLLC